## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NIGIL DOWDELL,** | **CIVIL ACTION** |
| **Plaintiff** | |
| **VERSUS** | **NO.  19-11410** |
| **CULPEPPER & ASSOCIATES** | **SECTION "E" (4)** |
| **SECURITY SERVICES, INC.,** | |
| **Defendant** | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Nigil Dowdell, brought an employment discrimination claim against her former employer, Culpepper & Associates Security Services, Incorporated ("CASS"). Plaintiff brings claims for (1) sexual harassment in violation of 42 U.S.C. 2001(e) *et seq*. ("Title VII") and (2) retaliation in violation of Title VII.[1] Plaintiff seeks compensatory damages, backpay, front pay, attorneys' fees, and punitive damages.[2]

The matter was tried before the Court, sitting without a jury, on September 21-23, 2020.[3] The Court heard live testimony from Plaintiff Nigil Dowdell, Brasuan Thompson, Freda Herbert, Ules LaBeaud, and Christopher Culpepper.[4] The parties submitted transcripts of the depositions of Alicia Washington, Stephanie Jackson, and Lieutenant Raymond Wissing.[5] The Court admitted into evidence Exhibits 1-65, 67-76, 78, 79, 82-84, 88, 90, 93-96, 101A, and 102-106.[6]

Having considered the testimony and evidence presented at trial, the depositions, the arguments of counsel, and the applicable law, the Court now issues these Findings of

---

[1] R. Doc. 126 at 2.
[2] R. Doc. 119 at 32-36.
[3] R. Docs. 127-129 (minute entries).
[4] *Id.*
[5] R. Docs. 130, 131, 132.
[6] R. Doc. 133.

Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

## FINDINGS OF FACT

### I.   Plaintiff's Personal History and Employment by CASS.

Plaintiff is married, and her husband is a merchant marine.[7] Plaintiff's husband works a rotating schedule; ordinarily, he is at sea for four months and then home for two months.[8] Plaintiff has two sons and one stepson. Both parties agree Plaintiff worked for CASS at the Veterans Affairs Hospital ("VA") from March 29, 2018 to July 9, 2018.[9] Plaintiff's sons were ages 2, 10, and 16 years old during that time.[10]

Plaintiff was hired by CASS in March of 2018 to work as a security guard at the VA.[11] To be hired, Plaintiff first filled out an online application.[12] On her application, Plaintiff indicated she could work the day, swing, and midnight shifts.[13] The application did not provide a definition of these terms.[14] Plaintiff believed the midnight shift ended at midnight, and she indicated she could work this shift.[15] Following Plaintiff's online interview, Plaintiff interviewed with Freda Herbert, CASS' site manager.[16] During this interview, Herbert asked questions about Plaintiff's home life, and Plaintiff responded

---

[7] Plaintiff's Testimony.
[8] *Id.*
[9] *Id.*; R. Doc. 117 at 1; R. Doc. 119 at 1.
[10] Plaintiff's Testimony.
[11] R. Doc. 117 at ¶ 1; R. Doc. 119 at ¶ 1.
[12] Exhibit 37; Plaintiff's Testimony.
[13] *Id.*
[14] *Id.*
[15] Plaintiff's Testimony.
[16] *Id.*

she had children and her husband is a merchant marine.[17] Plaintiff further explained to Herbert this meant her husband was not home for eight months of the year, and when he was at sea she did not have overnight childcare.[18] Plaintiff was hired by CASS approximately one week after her interview without further discussion of her inability to work overnight shifts.[19] When hired, Plaintiff was put on the day shift, from 7:00 a.m. to 3:00 p.m., and assigned to the Transitional Living/Rehabilitation Facility ("TLR") at the VA.[20]

Plaintiff's mother, Stephanie Jackson, and her sister are not always available to care for Plaintiff's children while Plaintiff is at work in the evenings.[21]   Jackson occasionally keeps her grandchildren overnight because she wants to see them, but she is not able to keep them overnight while Plaintiff is working on a regular basis because she works as a teacher and has to be at work too early to take Plaintiff's children to school.[22]

Plaintiff received a copy of the 2017 CASS employee handbook[23] at the time of her hiring. Plaintiff did not receive training on the policies included in the handbook or on sexual harassment procedures.[24] The handbook provided a telephone number for employees to call if they experienced sexual assault.[25]

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*; Jackson's Deposition, R. Doc. 131 at 2.
[22] Jackson's Deposition, R. Doc. 131 at 3, 5.
[23] Exhibit 1; Plaintiff's Testimony (Plaintiff states she read and understood the harassment policy in CASS' handbook).
[24] Plaintiff's Testimony.
[25] Exhibit 1; Plaintiff's Testimony.

## II.    Plaintiff's Sexual Assault and Her Report of the Incident.

While Plaintiff was employed by CASS, Ahmed Assad was Plaintiff's co-worker.[26] Assad's title was "supervisor," however, Assad did not have authority to hire or fire employees in Plaintiff's position. Assad is a military veteran and often goes to the VA for his doctors' appointments.[27] On June 5, 2018, all CASS employees were to attend a team meeting.[28] Plaintiff's shift ended at 3:00 p.m., after which she planned to attend the meeting.[29] Plaintiff was sitting in the same room as another co-worker, Jonathan Doucette, waiting to go to the meeting. When Assad arrived, he walked between Plaintiff and Doucette, approached Plaintiff, bent down, reached between her thighs, and grabbed her inner thigh and her vagina, through her clothing, saying "hey my girl, what's up muscles."[30] Assad then walked to the restroom.[31] Upon exiting, he said to Plaintiff, "You cheating on me, huh?"[32] Plaintiff testified she then said to Assad, "what are you f------ talking about," to which Assad replied he was just kidding. Plaintiff told Assad, "no you weren't, don't ever f------ touch me again."[33]

After the incident with Assad, Plaintiff walked to the staff meeting with Doucette. Doucette asked Plaintiff whether she was okay. Plaintiff recounted what Assad had said and done, and Doucette advised Plaintiff to report the incident to Herbert.[34] On that day, Plaintiff and Doucette encountered Brasuan Thompson. Thompson saw Plaintiff was crying and asked her what was wrong. Plaintiff told Thompson about her interaction with

---

[26] Plaintiff's Testimony.
[27] Washington's Deposition, R. Doc. 130 at 2.
[28] Plaintiff's Testimony.
[29] *Id.*
[30] *Id.*; Jackson's Deposition, R. Doc. 131 at 2.
[31] Plaintiff's Testimony.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Assad, to which Thompson responded that, if CASS had fired Assad the first time she reported him, this would not have happened.[35]

On June 13, 2018, Doucette sent an email to Christopher Culpepper, the operations manager at CASS, stating, "I Jonathan J. Doucette on June 5th, 2018 at approximately 3:50pm was walking in the hallway leading to the meeting when Officer Dowdell ask did I here (sic) what officer Assad said to her. I told officer Dowdell I did not, she then stated that Officer Assad told her "You cheating on me huh muscles" then he proceeded to squeeze her inner thigh two times."[36]

Plaintiff was the victim of a sexual assault by Assad. Her account of the sexual assault was credible and her testimony is corroborated by the email from Doucette to Culpepper described above,[37] as well as the testimony of Plaintiff's mother Stephanie Jackson,[38] VA employee Alicia Washington,[39] and Thompson. Plaintiff recounted the assault to Thompson shortly after it occurred. Plaintiff called her mother from work, crying, following the incident.[40] Plaintiff told Jackson in that call that a man "grabbed her in her crotch area as she was sitting down with another co-worker."[41] Washington knew Plaintiff because their posts at the VA were near one another.[42] Washington saw Plaintiff the day after the assault and could see Plaintiff was upset.[43] Plaintiff told Washington "she was sitting down with her and another co-worker, and the gentleman who assaulted her,

---

[35] Thompson's Testimony.
[36] Exhibit 31.
[37] *Id.*
[38] Jackson's Deposition, R. Doc. 131.
[39] Washington's Deposition, R. Doc. 130.
[40] Jackson's Deposition, R. Doc. 131 at 2.
[41] *Id.*
[42] Washington's Deposition, R. Doc. 130 at 2.
[43] *Id.*

he walked over to reach to give her a hug and reached in between her legs and kind of rubbed in between her legs and she moved his hand."[44]

Culpepper found Plaintiff's report of the assault credible and did not question the veracity of her testimony. On direct examination, Herbert testified she initially believed Plaintiff's allegations of sexual assault but that she changed her opinion because of "rumors" among VA employees that the situation did not transpire the way Plaintiff said it did. Herbert identified those two VA employees who questioned the Plaintiff's version of events as Mr. Smitty and Mr. Lionel. CASS did not call these individuals, or for that matter Assad, to testify at trial. Herbert's change of opinion was based on rank rumor and her biased testimony is unpersuasive.

The Defendant concedes Plaintiff promptly reported the sexual assault to CASS.[45] The Plaintiff first reported the sexual assault to Katina Gilmore, a CASS supervisor, via email on June 6, 2018.[46] In an email dated June 6, 2018, at 5:00 a.m., Plaintiff wrote to Gilmore:

> "yesterday coming to relieve me for the meeting mr Assad came in touched my thigh and said hey my girl wassup he went to the restroom and came back and said I heard that you were cheating on me I said what and he repeated hisself I asked him what the fuck was he talking about he laughed and said just kidding I want to make you aware because I think it's very unprofessional as my supervisor for that to go on it puts me in a compromising situation every time I have to work with him now I come here to do my job and get back to my kids and that all it should be and I should be comfortable doing so."[47]

---

[44] Washington Deposition, R. Doc. 130 at 6.
[45] At trial, CASS argued that Plaintiff did not properly report her sexual assault, according to the CASS employee handbook. The CASS employee handbook provides a telephone number for employees to call if they experience sexual harassment or assault. Plaintiff reported the assault to her supervisors, first to Gilmore, and then to Herbert, who then notified Culpepper.
[46] Exhibit 57.
[47] *Id.*

Five days later, after receiving no response, on June 11, 2018 Plaintiff emailed Freda Herbert, another CASS supervisor, to report the sexual assault.[48] In the email, Plaintiff wrote, "[h]ello Mrs Herbert I would like to speak with you concerning a incident I feel was inappropriate concerning a supervisor if it's possible to meet with you soon I would appreciate that thank you for your time."[49] Herbert confirmed she received the email.

Plaintiff met with Herbert and Gilmore on June 11, 2018.[50] In the meeting, Plaintiff recounted what happened between her and Assad on June 5, 2018. In response to Herbert's request, Plaintiff completed a CASS incident report during the meeting.[51] While Plaintiff was with Herbert and Gilmore, Herbert telephoned Culpepper to alert him to the situation.[52]  Plaintiff's incident report details the encounter:

> Tuesday June 5, 2018 @ 2:20 pm I was sitting in transitional living [Plaintiff's work post] with Doucette waiting for relief from Ahmad [Assad] (supervisor) so we can go to our team meeting. When Mr. Ahmad arrived on site he touched me on my left thigh in the inside and said whats up muscles. I was in shock. He walked to the bathroom and came back and then he said your cheating on me huh? I said what are you f------ talking about he laughed and winked and said I was just kidding and I said no you weren't. I got up and walked to the meeting. Office Doucette said I look uneasy are you ok I hold him I was very [illegible] what just happened and he said tell Freda [Herbert]."[53]

After Plaintiff wrote her incident report for CASS, and while Plaintiff was still in the room, Herbert called Lieutenant Raymond Wissing, a VA police officer. Herbert put Plaintiff on the telephone with him.[54] During Plaintiff's telephone conversation with Lieutenant Wissing, he said there was video surveillance in the area where Plaintiff was assaulted and that he would review the video. Plaintiff told him she hoped the incident

---

[48] Exhibit 16.
[49] *Id.*
[50] Plaintiff's Testimony.
[51] Exhibit 33.
[52] Plaintiff's Testimony.
[53] Exhibit 33.
[54] Plaintiff's Testimony; Wissing's Deposition, R. Doc. 132 at 4.

was caught on camera.[55] Lieutenant Wissing then asked Plaintiff to fill out an incident report for the VA.[56] Plaintiff filled out the report but never received a copy.[57] Lieutenant Wissing could not locate a copy of Plaintiff's written statement.[58] Lieutenant Wissing had a closed-door meeting with Assad as part of his investigation. Lieutenant Wissing wrote his own report in which he noted Plaintiff's experience constituted abusive sexual contact and intimate touching.[59] After meeting with Plaintiff and with Assad, Lieutenant Wissing found Plaintiff's report of the assault credible.[60] The VA did not hire Assad as a police officer.[61]

After Plaintiff reported the sexual assault to Herbert, Ules LaBeaud, CASS' site supervisor, sent an email dated June 11, 2018, to all female officers regarding a mandatory meeting to be held on June 12, 2018.[62] The email heading said, "Mandatory Meeting," and the email stated, "[p]lease be advised that all female officers need to attend a meeting on 6/12/18 Wednesday at 3pm, no excuses everyone needs to attend. All supervisors need to report to work for 2pm to relieve the officers to attend the meeting."[63] The meeting actually occurred on June 13, 2013, two days after Plaintiff reported the sexual assault to Herbert.[64] Plaintiff planned to attend the meeting, but Herbert asked Plaintiff to cover for another female officer and said it was not necessary for Plaintiff to attend.[65] Even though Herbert told Plaintiff no names would be used, Plaintiff believed her coworkers knew that

---

[55] Plaintiff's Testimony.
[56] *Id.*; R. Doc. 132, Wissing's Deposition at 5.
[57] Plaintiff's Testimony.
[58] Wissing's Deposition, R. Doc. 132 at 5.
[59] Exhibit 75; Wissing's Deposition, R. Doc. 132 at 5.
[60] Wissing's Deposition, R. Doc. 132 at 7.
[61] Plaintiff's Testimony; Washington's Deposition, R. Doc. 130 at 5; Wissing Deposition, R. Doc. 132 at 10.
[62] Exhibit 24.
[63] *Id.*
[64] Exhibit 47 is an email changing the date of the meeting from June 12, 2018, to June 13, 2018.
[65] Plaintiff's Testimony.

she was the person who had reported a sexual assault.[66] Because she did not attend the meeting, Plaintiff felt isolated and ostracized. At the meeting, Herbert instructed CASS security guards not to report incidents of sexual assault to the VA and that, if they did, she would find out about it.[67]

Both parties agree Assad was terminated from employment with CASS shortly after Plaintiff's report of the incident to Herbert.[68] There is a disagreement as to whether Assad was fired on June 11 or 12, 2018, but the difference is not material. A letter of termination dated June 12, 2018 was sent to Assad.[69] Plaintiff did not see Assad after his termination.[70] After the sexual assault, Plaintiff feared Assad would retaliate against her for reporting the incident, for causing his termination from CASS, and for causing him not to be hired as a VA police officer.[71] Plaintiff feared she would encounter Assad while she was on duty at the VA because Assad is a veteran and often went to the VA for doctors' appointments.[72]

Plaintiff generally was upset and uncomfortable after the sexual assault.[73] Following the sexual assault, she often cried at work.[74] LaBeaud was aware of Plaintiff's distress, as he was informed by Washington that she had seen Plaintiff crying while Plaintiff was on duty at the VA.[75] During a discussion between Plaintiff, LaBeaud, and Washington at the TLR a day after the assault, LaBeaud told Plaintiff she would not have

---

[66] *Id.*
[67] Thompson's Testimony.
[68] R. Doc. 117 at 3; R. Doc. 119 at 7.
[69] Exhibit 64.
[70] Plaintiff's Testimony.
[71] *Id.*
[72] *Id.*
[73] Jackson's Deposition, R. Doc. 131 at 2, 4.
[74] Plaintiff's Testimony.
[75] LaBeaud's Testimony; Washington's Deposition, R. Doc. 130 at 2.

to work night shifts and her work location would not be changed to a more remote post due to the sexual assault and Plaintiff's fear Assad might retaliate against her.[76]

### III. Plaintiff's Work Schedule and Location Changes.

#### A. Plaintiff's Schedule and Duty Posts Until Shortly After her Report of the Sexual Assault.

LaBeaud, as site supervisor, prepared the schedules for the security guards. The schedules were reviewed and approved by Herbert and Culpepper, and all three employees frequently discussed scheduling of employees. Plaintiff's shifts, from the time she was hired at the end of March 2018 until late June 2018, were for the most part during the daytime at the TLR.[77] Plaintiff occasionally worked the daytime shift at the Staff Parking or Patient Parking posts.[78] Plaintiff's schedules from April 2018 reflect that Plaintiff worked only day shifts at the TLR during the weeks of April 1-7 and April 8-14.[79] Plaintiff worked day shifts at the TLR the week of April 15-21, with the exception of one night shift on April 19, 2018, at the TLR.[80] Plaintiff continued to work day shifts at the TLR throughout the month of May 2018 and up until June 17, 2018.[81] The parties stipulated Plaintiff voluntarily worked three overnight shifts in the month of April 2018, on April 19, 22, and 26, prior to Plaintiff being sexually assaulted.[82] Plaintiff agreed to cover these overnight shifts for other employees because her husband was in town to care for their children on those days.[83] All of Plaintiff's other shifts during this time were scheduled during the daytime or ending before midnight.

---

[76] Plaintiff's Testimony; Washington's Deposition, R. Doc. 130 at 2, 4.
[77] Exhibit 3.
[78] Exhibit 101A.
[79] Exhibit 3.
[80] *Id.*
[81] *Id.*
[82] R. Doc. 127. The parties also stipulated Plaintiff did not work overnight on June 26, 2018.
[83] Plaintiff's Testimony.

On June 6, 2018 at 5:51 p.m., LaBeaud sent an email to all CASS officers.[84] The email states, "the schedule will now be 12hr shifts working starting on Sunday June 17, 2018 and this will be your schedule for the remainder of the year."[85] Plaintiff's schedule was sent to her in an email sent on June 6, 2018 at 6:46 p.m. Plaintiff's schedule reflected she was to work the day shift from 7:00 a.m. to 7 p.m., on June 17, 18, and 19, from 7:00 a.m. to 1:00 p.m. on June 20, and she was off on June 21, 22, and 23.[86] This schedule reflected day shifts at TLR, a continuation of Plaintiff's regular work schedule as to hours and location. Plaintiff was told and believed this would be her schedule for the remainder of the year 2018.[87]

**B.      Plaintiff's Schedule and Duty Posts After her Report of Sexual Assault.**

On June 17, 2018 at 4:19 p.m., LaBeaud sent all employees a revised schedule for the week for June 17 to 23, 2018.[88] In this email, LaBeaud writes, "[p]lease look at the schedule to make sure to see if any changes were made that effected your schedule."[89] The schedule shows that Plaintiff's schedule had changed and she was to work an overnight shift, from 7 p.m. to 7 a.m., on Thursday, June 21, 2018 at the TLR.[90] Plaintiff had gone from being off on June 21 to working an overnight shift on that day. It is unclear whether Plaintiff worked this shift. Plaintiff does not recall working any overnight shifts during June 2018.[91] Defendant presented a schedule showing that Plaintiff worked overnight shifts at the TLR on June 21 and 28, 2018,[92] and produced a handwritten sign in sheet

---

[84] Exhibit 41; Plaintiff's Testimony.
[85] Exhibit 41.
[86] Exhibits 42-43; Plaintiff's Testimony.
[87] Plaintiff's Testimony.
[88] Exhibit 48.
[89] *Id.*
[90] *Id.*
[91] Plaintiff's Testimony.
[92] Exhibits 101A; 104.

that appears to show Plaintiff signed in to work her shift from 7:00 p.m. to 7:00 a.m. on June 21, 2018 and June 28, 2018.[93] Plaintiff verified her signature on the time sheet but did not think she had written the time entries. Security guards at CASS do not clock in and they do not always enter the time they started or ended each shift. CASS did not prove Plaintiff worked two overnight shifts after the sexual assault.

Plaintiff did not receive a schedule by email for the week of June 24 to 30, 2018.[94] On June 26, 2018 at 2:01 p.m., LaBeaud sent an email to CASS employees stating "[o]n Wednesday July 4th we will be working a holiday schedule and everyone that is schedule to work that day is expected to be at work at their scheduled time. No vacation or requested days off will be granted at this time."[95] There was no mention of Essence Festival in the email or in any oral statement to employees by supervisors.[96] On June 28, 2018 at 12:35 p.m., Herbert sent an email to all CASS officers with their schedules for the week of July 1, 2018 to July 7, 2018.[97] Plaintiff was scheduled to work her regular daytime schedule at the TLR. On June 29, 2018, Plaintiff received a revised schedule for the week of July 1, 2018 to July 7, 2018.[98] This schedule showed Plaintiff was scheduled to work an overnight shift from 7:00 p.m. to 7:00 a.m. on July 5, 2018 at the TLR.[99]

Plaintiff  sent an email to LaBeaud informing him she was not able to work the overnight shift on July 5 because her husband was scheduled to leave that day,[100] and she

---

[93] Exhibit 104.
[94] Plaintiff's Testimony.
[95] Exhibit 8; Plaintiff's Testimony.
[96] *Id.*
[97] Exhibit 13; Plaintiff's Testimony.
[98] Exhibit 11.
[99] *Id.*; Plaintiff's Testimony.
[100] Exhibit 21; Exhibit 36 containing Plaintiff's husband's orders to board the Liberty Grace vessel on July 7, 2018. Plaintiff explained that at times the vessel is not ready to leave on the exact date previously expected for several reasons.

did not have overnight childcare.[101] Plaintiff's email to LaBeaud stated, "I need you to call me because the 5th I can't work my sons father goes back to work on the 5th and nobody won't be in town yet to watch him I can't do it."[102] Plaintiff did not receive a response from LaBeaud. LaBeaud forwarded Plaintiff's email to Herbert, telling Herbert "Mrs. Dowdell [Plaintiff] sent this and I already told here (sic) that the schedule is already done and she can fill out a switch request with someone but the schedule is not changing."[103]

On July 5, 2018, Plaintiff "called off" her overnight shift by calling her shift supervisor, Robert Body, more than four hours prior to the time it was to begin, per CASS handbook policy.[104] At CASS, a "call off" occurs when an employee calls his or her supervisor at least four hours prior to a shift and is then excused from working that shift, as opposed to a "no show," which occurs when an employee fails to communicate with his or her supervisor and fails to appear for a shift.

CASS' handbook covers the company's attendance policy.[105] On page 6 of the handbook, under the heading "Attendance & Punctuality," the handbook states:

> "If you are unable to report to work on time for any reason, it's your responsibility to insure you notify your supervisor a minimum of four (4) hours in advance. Texting or asking another employee, a friend, or relative to give this notification is not considered proper, except under emergency circumstances. If an employee is tardy, or leaves work early, a report will be sent to the Director of Operations at the corporate office."[106]

Further, under the heading "NO CALL/NO SHOW," the handbook states:

> "Punctuality and reliable attendance are essential to operations where employees relieve outgoing employees. Tardiness and no call/no shows are detrimental to operations, and may result in forced overtime for other employees. Employees failing to meet attendance standards are subject to the following corrective actions

---

[101] Exhibit 21; Plaintiff's Testimony.
[102] Exhibit 21.
[103] *Id.*
[104] Exhibit 1; Plaintiff's Testimony.
[105] Exhibit 1.
[106] *Id.* at 6.

– Employees without a previously write-up will be placed on "Final Warning", employees with a previous write-up will be terminated."[107]

The policy outlined in the handbook does not specify when call-offs will not be accepted.[108] It also does not require an employee to find his or her own replacement to cover a shift if an employee calls off.[109]  The CASS handbook requires CASS employees to notify their supervisors a minimum of four hours in advance of calling off.[110] The handbook further states that texting or asking another employee, friend, or relative to give notification is not considered proper, except under emergency circumstances.[111] The policy does not prohibit using email to call off a shift. The handbook also states that CASS may change or depart from any policy at any time at its sole discretion.[112] Plaintiff followed the handbook by calling her supervisor more than four hours in advance of missing her shift on July 5, 2018.

On July 6, 2018, Plaintiff received an email from Herbert containing a second revised schedule for the week of July 1 to 7.[113] This schedule showed Plaintiff called off on July 5, 2018.[114] The schedule contained a second overnight shift for Plaintiff that week on July 7, 2018 at the TLR. In the email, Herbert stated "[n]o call off will be accepted due to lack of manpower."[115] LaBeaud sent an email to CASS employees on July 7, 2018 at 6:49 p.m. stating, "[p]lease be advised that the message from the corporate office and Mrs. Herbert is the schedule is set to meet the needs of the clients and it will remain as it is."[116]

---

[107] *Id.*
[108] Exhibit 1; Plaintiff's Testimony.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] Exhibit 27.
[114] *Id.*; Plaintiff's Testimony.
[115] Exhibit 5.
[116] Exhibit 4.

Plaintiff was not comfortable working overnight shifts at the VA after the sexual assault, and emailed Herbert to let Herbert know that she would be unable to work the newly assigned overnight shift.[117] Plaintiff's email stated "[b]ecause of this situation I asked not to be put on overnight to other supervisors alone and the expressed that to you. You continue to put me in a situation that is unsafe for me. I will not be coming in tonight due to the situation at hand I called in 6 hours before my shift both days and I also expressed I wasn't able to work the shift yesterday last week. Yesterday would have been overtime for me as well."[118] Herbert responded, "I am unwear (sic) of your situation. As for the schedule, the schedule is made to fit the needs of the client, no one have any special privileges regarding the schedule. As you know, the schedule can change at any time. This doesn't base on what's fair or not."[119] Plaintiff called her shift supervisor, Robert Body, two times about six hours before her scheduled shift began on July 7, 2018 began. Plaintiff also text messaged and emailed Body to notify him that she had called him.[120] Plaintiff's email to Body, sent on July 7, 2018 at 1:27 p.m. stated, "[h]ello this is Nigil Dowdell informing you that I will be unable to come in tonight due to personal reasons thank you I have also called twice and sent out a text message."[121] Body later emailed Plaintiff.[122] In an email sent on July 7, 2018 at 3:22 p.m., Body stated, "[g]ood Afternoon Ofc. Dowdell...!!! I apologize for the technical difficulties with my phone. As I instructed you Thursday, Sup. Herbert isn't accepting any call offs due to lack of manpower. You are still responsible for reporting for duty at the time you are scheduled."[123]

---

[117] Exhibit 5.
[118] Plaintiff's Testimony; Exhibit 5.
[119] Exhibit 5.
[120] Exhibit 18; Plaintiff's Testimony.
[121] Exhibit 18.
[122] Exhibit 6.
[123] *Id.*

On July 7, 2020, Plaintiff and other security officers received schedules from LaBeaud via email for the week of July 8, 2018 to July 13, 2018, with LaBeaud noting "there has been some changes."[124] Plaintiff normally worked at the TLR post during the day.[125] The new schedule placed Plaintiff on *all* overnight shifts on July 8, July 9, July 10, and July 11, 2018 and *relocated her post* to the Central Energy Plant ("CEP").[126] It is clear from examination of LaBeaud's email that he swapped Plaintiff's schedule and duty post with what had previously been assigned to a security officer by the name of High. The CEP is a more remote location than the TLR.[127] The CEP is near a loading dock where trucks enter and leave. The window in the room where the guards sit is a small, long rectangle that makes it difficult for the guard to see people approaching from the left or right of the guard station. This increased Plaintiff's unease about working at this more remote location because she was concerned that Assad would attempt to retaliate against her. Washington confirmed there were no security cameras at CEP and that LaBeaud was aware of this.[128]

CASS presented evidence to attempt to show Plaintiff did not appear to work her shift on July 5, 2018, because she instead attended Essence Festival. On July 5, 2018 at 11:34 p.m., Plaintiff's husband tagged photos and a video of Plaintiff on Facebook and tagged her location at Club 7140.[129] Plaintiff testified her husband often tags her in photos as a way to connect with her, as he is away from home the majority of the year.[130] Plaintiff posted photos and video of herself to her Facebook account on July 5, 2018 with the

---

[124] Exhibit 9.
[125] Plaintiff's Testimony.
[126] Exhibit 9; Plaintiff's Testimony.
[127] Plaintiff's Testimony.
[128] Washington's Deposition, R. Doc. 130 at 2.
[129] Exhibit 105.
[130] Plaintiff's Testimony.

caption "Essence 2018."[131] Plaintiff has never attended Essence Festival because of her budgetary constraints. She posted the photograph with the caption because it was the week of Essence Festival.[132] The Court finds Plaintiff's testimony credible. CASS did not prove Plaintiff called off from work on July 5, 2018 to attend Essence Festival or to visit Club 7140.

## IV. Plaintiff's Termination.

On July 7, 2020, Plaintiff received an email from LaBeaud stating "[i]f you are unable to work the schedule assigned to you then you may be placed on a part time status."[133] The email also informed Plaintiff that Herbert wished to meet with her on July 9, 2018 at 10 a.m.[134] Both parties agree Plaintiff met with Herbert and LaBeaud on July 9, 2018, in the CASS conference room.[135] At the meeting on July 9, 2018 between Plaintiff, LaBeaud, and Herbert, Herbert asked Plaintiff why she had not come in for her shifts on July 5.[136] Plaintiff responded she had called her shift supervisor to call off on that date. Herbert called the shift supervisor and confirmed Plaintiff had called in.[137] Tensions in the meeting escalated. Herbert told Plaintiff to turn in her uniforms.[138] LaBeaud testified this was tantamount to a termination because employees cannot work without a uniform.

Following this meeting, Herbert emailed Culpepper. In her email, Herbert reported:

> "On Monday July 9, 2018 at approximately 0950am. Ms. Dowdell arrived in the conference room. I was sitting at the tabling reading the handbook, Mr. LaBeaud arrived in the conference room at 0957am. I asks Ms. Dowdell why she didn't show

---

[131] Exhibit 105.
[132] Plaintiff's Testimony.
[133] Exhibit 20.
[134] *Id.*
[135] R. Doc. 117 at 5; R. Doc. 119 at 13.
[136] Plaintiff's Testimony.
[137] *Id.*
[138] *Id.*; Exhibit 23.

up for work Thursday July 5, 2018. Saturday July 7, 2018, and Sunday July 8, 2018. She stated that she sent a email to Mr. LaBeaud on Friday June 29, 2018 that she will not be able to come in for work because her husband left and she had no one to watch her kids. I ask her what respond did she receive from Mr. LaBeaud, she stated that he informed her that the schedule was already made, she also stated that he told her she can find someone to switch with. after Ms. Dowdell made her statement about why she didn't report to duty on Thursday July 5, 2018. I ask start to ask her about Saturday July 7, 2017 why she didn't report to work. before I can get a chance to finished my stated, she rudely interrupt me and continue on to talk over me, I stated to Ms. Dowdell we are done talking about Thursday let's move on to Saturday, Ms. Dwodell stated to me by saying NO I MA NOT DONE TALKING!! In an aggressive manner, I stated to Ms. Dowdell that she will not speak too me that way I am her manager and you will respect me, Ms. Dowdell continue to talk over me. I ask Ms. Dowdell again why she did not report to work on Saturday July 7, 2018 for 7p to 7am at the Foyer. Once she calm down. She stated that she called Supervisor Body and he didn't not answer the phone she also stated she try contacting supervisor Body three times and there was no answer, I ask Ms. Dowdell why she didn't contact Mr. LaBeaud if she couldn't reach the supervisor on duty because Mr. Labeaud was already at work on Saturday July 7, 2018. There was no answer form Ms. Dowdell I ask her again still no answer, then she stated that she text supervisor Body to informed him the she was not coming to work. Approximately at 1002am I called supervisor Body, I ask him did he received a call from Ms. Dowdell, he state that he received a text message from her. I ask him did Ms. Dowdell give him a reason why she was trying to call off, he stated NO. I informed Ms. Dowdell in the employee handbook at page 12. It states texting or asking another employee, a friend, or relative to give this notification is not acceptable, I explain this too Ms. Dowdell. I had two witness Mr. LaBeaud and Officer Body. Once I explain to Ms. Dowdell the policy and procedures. Ms. Dowdell mage negative statement towards me, stating that I don't held the supervisor accountable that's what the problem is. I stated too Ms. Dowdell you will not talk to me in that manner I am trying to help you. At this point the situation escalated. I state to Ms. Dwodell she will be removed off the schedule. She started to get even more upset she started to raise her voice even more. I ask Ms. Dowdell to leave. Ms. Dowdell jumped up and start walking towards the door, she open the conference room door so hard that the back of the door hit the wall, then she turn back around and starting to charging towards me. At this time I ask Ms. Dowdell to leave.

The schedule constantly changes everyday due to lack of manpower. Last month Ms. Dowdell was schedule to work overnight at the TLR-Transitional Living which is her regular post. Its been many of times Ms. Dowdell was place on the schedule to work overnight and she never complain. Ms. Dowdell is not the only office who was place on the schedule to work extra shifts. Because of the lack of manpower we have to make sure all shifts was covered. This was not retaliation against Mrs. Dowdell or anyone else.

As for the situation with the issue concerning Ahmad Assad, that issue was resolved by VA police last month. Myself or any of the other officers hasn't seen Ahmad Assad since he was terminated."[139]

Herbert told Plaintiff she would be "removed off the schedule" during the meeting.

Herbert did not include in her email any mention of Plaintiff quitting her employment with CASS.

Additionally, LaBeaud sent an email to Culpepper after the meeting saying:

"On Monday July 9,2018 at approximately 9:57am Mrs Herbert had a meeting with Mrs. Nigil Dowdell about her No call – No show status on 3 separate occasions. Mrs Herbert started off by asking Mrs Dowdell about Thursday July 5,2018 and why didn't she come to work when she was schedule and told by Mr. LaBeaud and Mr. Body that because of manpower no call offs would be accepted and she would have to work her scheduled shift. Mrs Dowdell explained that she had told me on June29.2018 that she could not work because of a babysitter issue and that her mother would not return back until July 13,2018. Mrs Herbert said ok well why didn't you report to work on Saturday and she was trying to still explain about Thursday and how I didn't pass on the whole message. Mrs Herbert told her that she was done with Thursday and we are now talking about Saturday and Mrs Dowdell then said no we not done talking about Thursday in a loud voice and Mrs Herbert responded by saying that she was the manager and she needs to talk to her with respect and Mrs Dowdell said you not letting me finish in a loud voice so you not respecting me . Mrs Herbert said against we are done with Thursday and we are moving on to Saturday. Mrs Herbert asked her who she spoke to when she tried to call off and she said she spoke Body. Mrs Herbert Call Officer Body on the phone and I did and Mrs Herbert asked him did he speak to Mrs Dowdell about Saturday and he said no she texted me and I was having some technical difficulties with this pohone so if she called he didn't get the calls but after he sent her a response to her text letting her know that because of manpower no call offs would be accepted again and that she would be expected to work her scheduled shift. Mrs. Herbert told Mrs Dowdell that texting was not acceptable per of the Handbook and company policy. Mrs Dowdell said that she tried calling Mr Body 3 times and he didn't answer so that's why she sent the text. Mrs Herbert asked her why she did not Mr LaBeaud since she could"t (sic) get in touch with Mr Body and she gave no response. Mrs Herbert again asked so why didn't you call someone else if she couldn't get in touch with Mr Body and she answered her again in a loud voice that I called him 3 times and if he got the text then he must got the phone calls but was pushing me to voicemail and that the Supervisors are not held accountable and Mrs Herbert responded by saying that I do hold them accountable and that is why he is on the phone and answering the questions I'm asking. Mrs Dowdell again was very loud and said that already knew about her situation with Mr Ahmad and that she

---

[139] Exhibit 88.

was fearful of working in that area by herself. Mrs Herbert told her that she was scheduled at TLR on Thursday and she has worked that post overnight on the past scheduled and it wasn't a problem then and on Saturday you were scheduled in the Foyer so what was the problem because she stated in an email that she sent the reasons were different. Mrs Dowdell said that was not true and that we were aware of her situation and Mrs. Herbert told her that she was responsible for working out her own personal problems and that was not our responsibility. Mrs Herbert told her that she was done discussing the situation and that she was dismissed. Mrs Dowdell got up and said oh well in a loud voice and grabbed the door and swung it open all hard and it slammed up against the wall and then Mrs Herbert got up and told her to turn in her uniforms and she turns around as if she was coming at Mrs Herbert and then said that she was the reason why everything is happening to everyone around here and turned around and left."[140]

LaBeaud quoted Plaintiff as saying that Herbert already knew about her situation with Assad and that Plaintiff was fearful of working along in the CEP. LaBeaud quoted Herbert as telling the Plaintiff "she was responsible for working out her own personal problems" and that it was not CASS' responsibility. LaBeaud also quoted Herbert as telling the Plaintiff "to turn in her uniforms," which he said was tantamount to a dismissal. LaBeaud, like Herbert, did not include in his email any mention of Plaintiff quitting her employment with CASS.

At trial, Herbert testified that Plaintiff quit, and CASS did not terminate her. Plaintiff testified she did not quit and that, instead, she was terminated by CASS. Plaintiff's employment with CASS was terminated by her employer.

## V.     Reports of Sexual Harassment by Other CASS Employees.

Thompson was hired by CASS as a security guard.[141] Assad was Thompson's supervisor. Assad made Thompson uncomfortable because he was unprofessional, often talking about his sex life in her presence.[142] Thompson had multiple interactions with Assad that made her uncomfortable, among them incidents during which he rubbed his

---

[140] Exhibit 23.

[141] Thompson's Testimony.

[142] *Id.*

private parts against [her], touched her thigh, talked about his sex life with his girlfriend, and talked about his being uncircumcised.[143] These incidents happened over a three to four month period.[144] Thompson reported these incidents to Gilmore and LaBeaud around March 2018. After Thompson reported these incidents to LaBeaud, he called Herbert.[145] Thompson met with Herbert, reported what happened, and wrote a statement. Thompson was not given a copy of the statement. Herbert then called Culpepper. Herbert asked Thompson to step outside while Herbert spoke to Culpepper. When Thompson returned to the room, Herbert said she would do an investigation. That was the last Thompson heard of the matter. Assad continued to work at CASS. No investigation was made, and no action was taken by CASS to prevent further sexual harassment by Assad.

Thompson testified her roommate at the time, Jasmine Patton, experienced similar incidents with Assad, such as Assad telling Patton that he was uncircumcised.[146] Thompson also testified that Cheryl Cauley, another CASS employee, had similar experiences with Assad. Neither of these employees testified at the trial. Herbert admitted that Thompson reported to her that Patton had complained of inappropriate comments by Assad. Herbert testified she met with Patton and Patton reported having a conversation with Assad about circumcision. Herbert did not meet with Assad about this incident or do any other investigation.

Thompson was still employed by CASS in June 2018 when Plaintiff was assaulted by Assad. Thompson saw Plaintiff leaving a meeting, crying, and asked her what was wrong. Plaintiff told Thompson about her interaction with Assad, to which Thompson

---

[143] *Id.*
[144] *Id.*
[145] *Id.* Herbert denied these incidents were reported to her but the Court does not find her testimony to be credible.
[146] Thompson's Testimony.

21

responded that, if CASS had fired Assad the first time she reported him, this would not have happened.[147]

When Plaintiff made her oral report of the assault to Lieutenant Wissing, Plaintiff mentioned that Assad had sexually harassed or assaulted other female employees at CASS.[148] This information had not previously been reported by CASS to the VA,[149] even though Thompson reported these incidents to Herbert in March 2018, two months prior to Assad's assault on Plaintiff. Thompson told Lieutenant Jones of the VA that she had reported sexual harassment by Assad to Herbert but that nothing had happened. Lieutenant Jones and Lieutenant Wissing asked Thompson to meet with them as part of their investigation into Plaintiff's complaint.[150] Thompson told Lieutenant Wissing that Assad had talked to her about other people having sex and also about his uncircumcised penis, and that he made similar remarks to another female officer, Patton.[151] Lieutenant Wissing was "pretty sure that we did talk to Ms. Freda [Herbert] about that report [Thompson's report] as well as...Patton."[152] Lieutenant Wissing also spoke to another CASS supervisor, Paul Mitchell. Mitchell told Lieutenant Wissing the incidents reported by Thompson had been reported to him initially, and he had spoken to Herbert about them. Lieutenant Wissing testified that Mitchell said Herbert told him that "it was taken care of."[153] In Lieutenant Wissing's report, he said, "I spoke with Herbert about the incident, she stated the guards who made any accusations against Mubarak [Assad] recanted their statements and saw no wrongdoing. Herbert stated this was an internal

---

[147] *Id.*
[148] Wissing's Deposition, R. Doc. 132 at 6.
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.*

matter to the company so she did not report these incidents to the VA Police to investigate."[154] In his deposition, Lieutenant Wissing confirmed this portion of his report was correct.[155] Herbert testified at trial the "guards who made any accusations against Mubarak" were Thompson and Patton. Culpepper testified that he knew of Thompson's conversation with Assad about circumcision.

## CONCLUSIONS OF LAW

### VI.   Title VII.

42 U.S.C.A. § 2000e ("Title VII") of the Civil Rights Act prohibits an employer from discriminating against any individual "with respect to compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin."[156] Prior to filing a civil action under Title VII, a complainant must timely file a charge with the Equal Employment Opportunity Commission ("EEOC"), or with a state or local agency with authority to grant or seek relief from the alleged unlawful employment practice.[157] The Court already determined that Plaintiff exhausted her administrative remedies with regards to her sexual harassment hostile work environment and retaliation claims.[158]

### A.   Plaintiff Has Proven Her Sexual Harassment Hostile Work Environment Claim.

Sexual harassment is a form of sex discrimination under Title VII.[159] The Supreme Court has recognized two forms of sexual harassment claims under Title VII: (1) quid pro

---

[154] Exhibit 75, Culpepper 544.
[155] Wissing Deposition, R. Doc. 132 at 8.
[156] 42 U.S.C.A. § 2000e(a)(1).
[157] 42 U.S.C.A. § 2000e-5.
[158] R. Doc. 88.
[159] *Gaudet v. City of Kenner*, 2012 WL 1995295 at *2 (E.D. La. June 4, 2012).

quo claims, and (2) claims in which bothersome attention or sexual remarks create a hostile work environment.[160] This case involves the latter.

In order to prove a case for sexual harassment hostile work environment under Title VII, a plaintiff must show: (1) membership in a protected group; (2) unwelcome sexual harassment; (3) harassment complained of is based on sex; (4) harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[161]

The first three elements are plainly met. Plaintiff is a woman. Sex is a protected class under Title VII.[162] Plaintiff's genitals were inappropriately touched by a person of another gender, which was unwelcome sexual harassment based on sex. Plaintiff also must prove the fourth and fifth elements – harassment was severe or pervasive such that it altered a term, condition, or privilege of Plaintiff's employment with CASS and CASS knew or should have known of the sexual harassment and failed to act.

For harassment to be severe or pervasive, the harassment complained of must affect a term, condition, or privilege of employment. "For sexual harassment to be actionable under Title VII, it must be sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment."[163] "[T]he test—whether the harassment is severe or pervasive—is stated in the disjunctive. An egregious, yet isolated, incident can alter the terms, conditions, or privileges of

---

[160] *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998); *Burlington Indus. v. Ellerth*, 118 S. Ct. 2257 (1998).
[161] Williams-Boldware v. Denton County, Tex., 741 F.3d 365 (5th Cir. 2014), citing Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012).
[162] 42 U.S.C. 2001(e) *et seq*.
[163] *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (emphasis added).

employment and satisfy the fourth element necessary to constitute a hostile work environment."[164] The Fifth Circuit uses an objective "reasonable person" standard to evaluate severity and pervasiveness.[165] "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[166]  In determining whether a work environment meets this standard, the court considers the totality of the circumstances, "including frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."[167]

Plaintiff experienced a single incidence of sexual assault; as a result, the conduct was not pervasive. Nevertheless, to meet the fourth element the conduct complained of may be severe *or* pervasive. "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment."[168]  In determining a motion for summary judgment, the court in *Brandon v. Woodspring Suites Shreveport-Bossier City L.L.C.*, found a single instance of sexual harassment, in which the aggressor told the plaintiff to look at what she was doing to him and showing his penis to her, constituted severe harassment.[169]  The Fifth Circuit in *Harvill v. West Communications, L.L.C.,* acknowledged "direct contact with an intimate body part constitutes one of the most

---

[164] *Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007).
[165] *Acosta v. Boudreau & Thibodeau's Cajun Cookin' Inc.,* 2017 WL 3521595 at 3 (E.D. La. Aug. 16, 2017).
[166] *Faragher v. City of Boca Raton,* 118 S. Ct. 2275, 2283 (1998).
[167] *Id.*
[168] *Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (citing *Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 434-35 (5th Cir. 2005).
[169] *Brandon v. Woodspring Suites Shreveport-Bossier City L.L.C.,* 2020 WL 1862148 at *3-4 (W.D. La. April 13, 2020).

severe forms of sexual harassment."[170] In that case, plaintiff testified that a co-worker grabbed her and kissed her on the cheek and touched her breasts and buttocks numerous times.[171] The court found "the deliberate and unwanted touching of [plaintiff's] intimate body parts can constitute severe sexual harassment."[172] In this case, Assad touched Plaintiff's upper thigh and vagina, through her clothing, which is direct contact with an intimate body part.

The Court considers whether Assad's conduct was severe under the reasonable person standard. Plaintiff testified Assad approached her at work, put his hand between her legs, and groped her inner thigh and her vagina, through her clothing.[173] A reasonable person could consider this behavior to be severe. Plaintiff's testimony showed that she subjectively found Assad's conduct to be humiliating and upsetting. Plaintiff testified she was offended by the touching and that she had never before been in the situation where she was inappropriately touched by a co-worker.[174] Plaintiff's family and co-workers clearly could see that she was upset immediately after the assault and for months afterward. The sexual harassment in this case was severe under both objective and subjective standards. The conduct affected a term or condition of Plaintiff's employment.

The fifth element of a hostile work environment claim is whether the employer knew or should have known of the harassment but failed to take prompt remedial action. In order to take prompt remedial action, "[a]n employer should promptly take all necessary steps to investigate and correct any harassment, including warnings and

---

[170] *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428 (5th Cir. 2005) (quoting *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001).
[171] *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428 (5th Cir. 2005).
[172] *Id.*
[173] Plaintiff's Testimony.
[174] *Id.*

appropriate discipline directed at the offending party, and should generally develop other means of preventing harassment within the agency."[175] To constitute "prompt remedial action," an employer's response to a harassment complaint must be "reasonably calculated" to end harassment.[176] "What constitutes prompt remedial action, sufficient to avoid liability, is a fact-specific inquiry and not every response by an employer will be sufficient to absolve the employer of liability under Title VII."[177]

The Supreme Court has held that when the harassing employee is the plaintiff's co-worker, the employer is liable only if it was "negligent in controlling working conditions."[178] Employers are liable for a co-worker's harassment only "when they have been negligent either in discovering or remedying the harassment."[179] An employer has constructive knowledge of harassment "if through the exercise of reasonable care it should have known what was going on but failed to address it," or, "[i]f the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes."[180]

A defendant may avoid Title VII liability when harassment occurred by showing the defendant took "prompt remedial action" to protect the claimant.[181] "What constitutes prompt remedial action is a fact-specific inquiry and 'not every response by an employer will be sufficient' to absolve the employer of liability under Title VII.[182] In its defense,

---

[175] *Id.* at 479 (quoting *Bundy v. Jackson* 641 F.2d 934, 947 (D.C. Cir. 1981)).
[176] *Kreamer v. Henry's Towing*, 150 Fed. Appx. 378, 382 (5th Cir. 2005) (citing *Skidmore v. Precision Printing & Packaging*, 188 F.3d 606, 615 (5th Cir. 1999).
[177] *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 640 (5th Cir. 2014).
[178] *Vance v. Ball State University*, 570 U.S. 421, 424 (2013).
[179] *Rosales v. City of San Antonio, Texas*, 2001 WL 1168797 at *5 (W.D. Tex. July 12, 2001) (quoting *Williamson v. City of Houston*, 148 F.3d 462, 465-66 (5th Cir. 1998)).
[180] *Arrieta v. Yellow Transp.*, Inc., 2008 WL 5220569 (N.D. Tex. Dec. 12, 2008) (quoting *Sharp v. City of Houston,* 164 F.3d 923, 930 (5th Cir. 1999)).
[181] Williams-Boldware v. Denton County Tex., 741 F.3d 635 (5th Cir. 2014).
[182] *Id.*

CASS argues that it had no knowledge of Assad's harassing behavior prior to Plaintiff's report in June 2018 and took prompt remedial action in response to Plaintiff's complaint.[183] Plaintiff has proven Thompson reported she had been sexually assaulted by Assad to Gilmore and LaBeaud around March 2018. After Thompson reported these incidents to LaBeaud, he called Herbert.[184] Thompson met with Herbert, reported what happened, and wrote a statement. Herbert then called Culpepper. From Thompson's report, CASS had notice of Assad's sexual harassment in March 2018.

Plaintiff testified that when she met with Herbert to report her incident with Assad, Herbert said "she thought she knew who it was, but go ahead anyway."[185] In her VA interview, Plaintiff mentioned to Lieutenant Wissing that other female CASS employees had been sexually harassed by Assad. To follow up on Plaintiff's report, Lieutenant Wissing spoke to several CASS employees, including Paul Mitchell, another CASS supervisor, Doucette, and Thompson.[186] Lieutenant Wissing confirmed that Mitchell said the incidents between Thompson and Assad had been reported to Mitchell as a CASS supervisor. Lieutenant Wissing further testified that Mitchell told him that Mitchell had relayed the information to Herbert, and Herbert responded to Mitchell that the situation was "taken care of."[187] Lieutenant Wissing also spoke to Thompson following Plaintiff's report of sexual assault. Lieutenant Wissing testified that Thompson told him Assad had talked to her about people having sex across the street from the TLR and talked about his

---

[183]CASS also argues that, because *Plaintiff* did not know of prior reports of Assad's sexual harassment before June 5, 2018, there can be no finding that CASS had constructive knowledge of the harassment. Defendant uses the wrong analysis; whether Plaintiff knew of the alleged conduct is not relevant. Only whether CASS knew or should have known of the sexual harassment is relevant.

[184] Thompson's Testimony.

[185] Plaintiff's Testimony.

[186] Wissing's Deposition, R. Doc. 132 at 6.

[187] *Id.*

penis being uncircumcised. Thompson also told Wissing that Assad had similar interactions with another female CASS employee, Patton.[188] Lieutenant Wissing testified that Thompson told him she had reported the instances of sexual harassment to Herbert around March 30, 2018, several months prior to Plaintiff's sexual assault.[189] Despite multiple CASS managers having knowledge about Assad's harassing behavior in March 2018, CASS failed to take any action at that time.[190]

The Court finds through the exercise of reasonable care CASS knew or should have known of Assad's behavior in March 2018, several months prior to Plaintiff's complaint, but CASS failed to exercise reasonable care to prevent or promptly correct Assad's sexually harassing behavior. Plaintiff has proven her claim of sexual harassment hostile work environment under Title VII.

### B.   Plaintiff Has Proven Her Retaliation Claim.

A plaintiff may use either direct or circumstantial evidence to prove a case of retaliation under Title VII.[191] "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption."[192] If a plaintiff presents direct evidence, the *McDonnell Douglas* test does not apply.[193] More often, a plaintiff relies on circumstantial evidence, which requires the court to apply the *Mcdonnell Douglas* burden-shifting analysis.[194] Under the *McDonnell Douglas* test, the plaintiff must first demonstrate a prima facie case of retaliation.[195] If successful, the

---

[188] Wissing's Deposition, R. Doc. 132 at 6.
[189] Wissing's Deposition, R. Doc. 132 at 7.
[190] Thompson's Testimony.
[191] *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 n. 3 (1983).
[192] *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (1993).
[193] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[194] *Smith v. Touro Infirmary,* 2015 WL 5093487 at *2 (E.D. La. Aug. 28, 2015) (applying *McDonnell Douglas* analysis to determine motion for summary judgment).
[195] *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5t h Cir. 1994) (applying *McDonnell Douglas* test).

burden of production shifts to the defendant to show a legitimate and nondiscriminatory basis for the adverse employment decisions.[196] Finally, the plaintiff must then show the defendant's proffered reason for the adverse employment decision is pretextual or unworthy of belief.[197]

In order to determine which analysis to apply, the Court first looks to whether there is direct evidence of intentional discrimination. In this case, Plaintiff has not produced any evidence that, on its face, shows Defendant acted in a discriminatory way. "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face."[198] In the absence of direct evidence showing Defendant's alleged discriminatory motive, Plaintiff relies on circumstantial evidence, and therefore the *McDonnell Douglas* burden shifting analysis applies. Plaintiff must first establish a prima facie case of retaliation.[199] If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision.[200] If the employer does so, the burden shifts back to the plaintiff to prove the employer's given reasons are a pretext for retaliation.[201] The plaintiff establishes pretext by showing the adverse action would not have occurred "but for" the employer's retaliatory motive.[202] At the pretext stage, the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar* requires more than a showing of mere temporal proximity.[203]

---

[196] *Id.*
[197] *Id.*
[198] *Portis v. First Nat'l Bank of New Albany, Miss.,* 34 F.3d 325, 329 (5th Cir. 1994).
[199] *See Smith v. Touro Infirmary,* 2015 WL 5093487 at *2 (E.D. La. Aug. 28, 2015).
[200] *Id.* (quoting *LeMaire v. Louisian*a, 480 F.3d 383, 388-89 (5th Cir. 2007)).
[201] *Id.*
[202] *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517 (2013)).
[203] *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Title VII prohibits an employer from taking adverse employment action against an employee because she engages in a protected activity.[204] To establish a prima facie case of retaliation, a plaintiff must show that: (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.[205]

An employee engages in a protected activity if she opposes any unlawful employment practice, or makes a charge, testifies, assists, or participates in any manner in an investigation, proceeding, or hearing under Title VII.[206] Plaintiff participated in a protected activity by reporting a sexual assault and filing an EEOC charge, and therefore meets the first element.

"An adverse employment action is one that 'a reasonable employee would have found … [to be] materially adverse,' which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[207] The Supreme Court has held in a Title VII retaliation and sexual harassment case that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."[208] Plaintiff's schedule changed, in both time and duty post, shortly after she reported the sexual assault. Plaintiff's supervisors were aware at the time of her employment by CASS that Plaintiff had young children and could not work overnight shifts when her husband was out of town. Plaintiff informed Herbert and LaBeaud she was fearful of working at

---

[204] *Joseph v. Phillips*, 2014 WL 5429455 at *3 (E.D. La. Oct. 24, 2014).
[205] *Feist v. La. Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007)).
[206] 42 U.S.C § 2000e-3(a).
[207] *Hernandez v. Yellow Transp. Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008)).
[208] *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 69 (2006).

CEP, a more remote location, and concerned about working overnight following her recent sexual assault. Plaintiff's schedule and duty post changes and Plaintiff's termination are adverse employment actions that a reasonable employee would find materially adverse.

At the prima facie case stage, a causal link between the adverse employment action and the protected activity can be satisfied "simply by showing close enough timing between [the] protected activity and [the] adverse employment action."[209] *Nassar*'s heightened but-for causation requirement applies only in the pretext stage of the *McDonnell Douglas* analysis and is not a required element of a prima facie case.[210] "At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action."[211] In *Garcia v. Professional Contract Services, Incorporated*, the Fifth Circuit held that two and a half months between the protected activity and adverse employment action was close enough.[212]

In this case, Plaintiff reported the sexual assault to CASS on June 6 and June 11, 2018. On June 17, 2018, she was assigned to work overtime on an overnight shift at the TLR.[213] Thereafter, CASS continued to schedule Plaintiff on overnight shifts. Plaintiff's schedule for the week of July 8 to 14, 2018 reflects all overnight shifts at CEP,[214] despite Plaintiff's telling her supervisors she did not have childcare to work overnight shifts and telling her supervisors of her fear of working at night at CEP's more remote location.

---

[209] *Abbood v. Texas Health and Human Services Comm.*, 783 Fed. Appx. 459 (5th Cir. 2019) (citing *Garcia v. Professional Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)).
[210] *Garcia v. Professional Contract Services, Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).
[211] *Id.*
[212] *Id.*
[213] Exhibit 48.
[214] Exhibit 9.

Plaintiff was terminated on July 9, 2018, approximately one month following her report of sexual assault. At this stage, Plaintiff has established a causal link between the reporting of the sexual assault and the adverse employment actions taken against her.

Because Plaintiff established a prima facie case of retaliation, the burden shifts to her employer to provide a legitimate reason for the employment actions taken. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment."[215] The defendant must articulate a legitimate, nondiscriminatory, or nonretaliatory reason for its employment actions, in this case, Plaintiff's schedule and duty post changes and termination.[216] LaBeaud, Herbert, and Culpepper gave different reasons for Plaintiff's changing schedule and duty post. In response to questions about Plaintiff's change in schedule, LaBeaud testified that any CASS employee's schedule can change at any time and that Plaintiff's schedule and duty post changed because it was important for all guards to be familiar with and trained to work all of the different locations and shift times. Later, LaBeaud testified Plaintiff's schedule was changed on July 5 because of a manpower shortage. Then, he testified Plaintiff was placed on an overnight shift on July 7 because she was "off" and was available. Finally, he testified the schedules of Dowdell and High were swapped the week of July 9 because the Plaintiff needed to be trained to work all shifts and duty posts.

Herbert also gave conflicting testimony. At trial, Herbert testified she did not know why the schedule changes had been made. In her deposition, Herbert stated CASS had been fully staffed the first week of July in 2018. At trial, she testified that multiple employees had called off or quit recently, and no call offs would be allowed that week due

---

[215] *McCoy v. Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).
[216] *Id.*

to "lack of manpower." Employee schedules for the weeks of July 1 and July 8 show no changes in the names of the security guards.[217]  The schedule does not reflect that anyone has quit or been terminated. Herbert could not identify any employees who had quit or been terminated

Culpepper testified Plaintiff was moved to nights because the assault occurred during the daytime and he thought it would be better for her to make a change and work at night. He also testified he changed her duty post to the CEP because it was safer, even though he admitted it was more remote. Culpepper relied on the CASS handbook's reservation of the company's right to deviate from its policies at any time as justification for its actions. Culpepper also testified that the first week of July was the week of Essence Festival, which CASS considered a holiday along with Mardi Gras and Jazz Festival, and CASS had the right to determine not to accept an employee's call off during that time.

No explanation was given for Plaintiff's termination because CASS maintains she was not terminated and instead quit.

CASS has articulated a non-discriminatory reason for its employment actions against Plaintiff. The burden shifts to the Plaintiff to show retaliation was the real motive.

"[O]nce the employer offers a legitimate, nondiscriminatory reason … the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive."[218] In other words, the plaintiff must present evidence the proffered reason for the employment action is a pretext for unlawful discrimination. In *Wallace v. Seton Family Hospitals*, the Fifth Circuit held an employer's shifting explanations for firing plaintiff, the suspicious temporal proximity between plaintiff's protected activity and

---

[217] R. Doc. 62, Culpepper 62-63, Dowdell 13-14.
[218] *McCoy v. Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007).

termination, as well as evidence plaintiff was disciplined differently from other employees, was sufficient evidence of pretext.[219]

Plaintiff argues the stated reasons given by Defendant for Plaintiff's schedule and duty location changes, as well as her termination, are pretextual. Plaintiff's schedule and duty post changes and her termination occurred within a month of Plaintiff's report of sexual assault. Plaintiff had no notice that call offs would not be accepted on July 5, 7, or 8, 2018—employees were only notified that call offs would not be accepted on July 4, 2018.[220] Prior to July, Plaintiff had worked only three overnight shifts, April 19, 22, and 26 and those were at the TLR, prior to the assault, and when her husband was home. Defendant argues Plaintiff worked additional overnight shifts in June, after the assault, but Defendant's inconsistent and unverified testimony and scheduling reports do not prove this. Plaintiff testified she does not remember working overnight shifts in June 2018. Plaintiff was informed her normal, day schedule at the TLR would continue for the rest of the year.[221] Herbert, LaBeaud, and Culpepper gave inconsistent and incredible testimony regarding Plaintiff's altered working conditions as to time and location.

Plaintiff has proven the reasons given by CASS for its actions were pretextual and retaliation was the real motive for Plaintiff's schedule and duty post changes and her termination. These changes would not have occurred but for CASS' retaliatory motive. Accordingly, Plaintiff has proven she was retaliated against in violation of Title VII.

## VII.   Plaintiff is Entitled to Compensatory Damages.

Plaintiff is seeking compensatory damages for emotional distress and loss of enjoyment of life. Plaintiff testified about her damages at trial. Plaintiff testified that, as a

---

[219] *Wallace v. Seton Family of Hosps.*, 777 F. Appx. 83, 93 (5th Cir. 2019).
[220] *See* Exhibit 8.
[221] *See* Exhibit 41.

result of the sexual assault, she felt sad, violated, and afraid. She experienced stress, anxiety, depression, marital strain, and gained a significant amount of weight.[222] After the sexual assault, Plaintiff stopped exercising as much as she had prior and began overeating.[223] Due to Plaintiff's termination, Plaintiff's husband has not been able to cover all of the family's bills and has to work more offshore. As a result of financial problems, Plaintiff lost her vehicle.[224] Plaintiff's relationship with her husband has suffered and changed significantly.[225] Plaintiff's sons have witnessed her crying at home.[226] Plaintiff's mother, Jackson, testified Plaintiff's sons reported their mother often cried at home and her sons were concerned that it was their fault.[227] Washington and Thompson testified they had seen Plaintiff crying and upset at work.[228] LaBeaud also corroborated Plaintiff's testimony regarding her emotional distress.[229]

"Damages are available for the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. A plaintiff's testimony may be sufficient to establish emotional distress."[230] A plaintiff's testimony may justify an award of compensatory damages.[231] Expert testimony is not necessary but may affect the amount recovered.[232] Emotional harm may be evidenced through loss of self-esteem, marital strain, sleeplessness, anxiety, stress, depression,

---

[222] Plaintiff's Testimony.
[223] Jackson's Deposition, R. Doc. 131 at 10-11.
[224] Plaintiff's Testimony.
[225] *Id.*
[226] *Id.*; Jackson's Deposition, R. Doc. 131 at 12.
[227] Jackson's Deposition.
[228] Washington's Deposition.
[229] LaBeaud's Testimony.
[230] EEOC Enforcement Guidance on Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of 1991, No. 915.002 (July 14, 1992).
[231] *Price v. City of Charlotte, N.C.*, 93 F.3d 1241 (4th Cir. 1996).
[232] *Vadie v. Mississippi State University*, 218 F.3d 365, 378 (5th Cir. 2000).

humiliation, and other physical manifestations.[233] An award for emotional harm is warranted only if there is sufficient causal connection between the respondent's illegal actions and the plaintiff's injury.[234]

The Court finds Plaintiff did suffer emotional distress and a loss of enjoyment of life as a result of the sexual assault and a causal relationship exists between Plaintiff's injury and the Defendant's actions. The Court awards Plaintiff $25,000 in compensatory damages. "Prejudgment interest should apply to all past injuries, including past emotional injuries."[235]

## VIII.  The Plaintiff is Entitled to Back Pay But Not Front Pay.

Plaintiff was terminated on July 9, 2018. In December 2018, Plaintiff began working in a nail salon, where she made $200-300 per week, and worked there for several months.[236] Following that job, Plaintiff worked at a different salon, where she made $10.50 an hour.[237] Plaintiff lost this job due to COVID-19 and remained unemployed at the time of trial.[238] Starting on April 25, 2020, Plaintiff began receiving unemployment benefits.[239] Plaintiff has been actively looking for and applying for different employment opportunities.[240]

Under 42 U.S.C. § 2000e-5(g) back pay is recoverable "[i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice." In order to be entitled to backpay, plaintiff must make a

---

[233] EEOC Enforcement Guidance on Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of 1991, No. 915.002 (July 14, 1992).
[234] *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977).
[235] *Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002).
[236] Plaintiff's Testimony.
[237] *Id.*
[238] *Id.*
[239] Exhibit 17; Plaintiff's Testimony.
[240] Plaintiff's Testimony.

reasonable effort to find other suitable employment.[241] The Court finds Plaintiff made a sufficient attempt to secure alternate employment. In order to calculate backpay "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."[242] The employer maintains the burden of proof on when the backpay period ends.[243]

Dr. Rice, an expert who testified on behalf of Plaintiff, opined in his September 10, 2020 report that Plaintiff's "annualized salary" at CASS in 2018 would have been $39,086.88.[244] Dr. Rice assumes Plaintiff, following her termination from CASS, was employed at a nail salon where she earned a total of $8,400.00 and then at another salon where she earned $2,824.67.[245] Dr. Rice subtracted these earnings from the amount Plaintiff would have earned working at CASS through the day of trial, to total $75,087.73. Dr. Rice then subtracted unemployment benefits Plaintiff has received since April 19, 2020, resulting in the final backpay amount of $72,733.73. Defendant did not object to Dr. Rice's expertise or his report or provide any evidence to the contrary. Defendant also did not argue Plaintiff failed to mitigate her damages. The Defendant has the burden of proof of proving payment of backpay should be negated or mitigated.[246] The evidence at trial supports the conclusions of Dr. Rice's report. Plaintiff is awarded $72,733.73 in backpay.

---

[241] *Floca v. Homcare Health Services, Inc.*, 845 F.2d 108 (5t h Cir. 1988) (citing 42 U.S.C. § 2000e-5(g)).
[242] 42 U.S.C. § 2000e-5(g).
[243] *G &T Terminal Packaging Co. v. NLRB*, 459 F. App'x 19, 23 (2d Cir. 2012).
[244] Exhibit 39.
[245] *Id.*
[246] *G &T Terminal Packaging Co. v. NLRB*, 459 F. App'x 19, 23 (2d Cir. 2012).

An award of front pay is intended to compensate the plaintiff for wages and benefits she would have received from her employer in the future if not for the discrimination.[247] Front pay is available only in limited circumstances.[248] The Fifth Circuit has held that front pay is appropriate only when reinstatement is not feasible.[249]

To determine whether reinstatement is feasible, the Fifth Circuit "has approved as permissible the consideration of factors such as the availability of positions, the displacement of innocent employees, a plaintiff's success in securing other similar employment, and the need for certainty and predictability in personnel decisions in determining whether to award reinstatement."[250] Other factors to be considered include whether "discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy," whether "defendant's management intimidated or threatened" the plaintiff, or whether the termination harmed the plaintiff's emotional well-being.[251] "In situations where 'discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy,' a court may consider an award of front pay in lieu of reinstatement."[252] In this case, Plaintiff was ostracized and retaliated against after her report of sexual assault. Due to CASS' actions, and the resulting litigation, it is clear to the Court that Plaintiff's reinstatement at CASS is not feasible.

---

[247] *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002).

[248] *Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.,* 865 F.2d 1461, 1469 (5th Cir. 1989).

[249] *Reneau v. Wayne Griffin & Sons, Inc.,* 945 F.2d 869, 870 (5th Cir. 1991); *see also Hansard v. Pepsi-Cola Metropolitan Bottling Co*., *Inc.,* 865 F.2d 1461, 1469 (5th Cir. 1989) ("It has been held that front pay cannot be recovered unless the plaintiff shows that reinstatement is not feasible.").

[250] *Ogden v. Wax Works, Inc.,* 29 F. Supp.2d 1003, 1009 (N.D. Iowa 1998) (citing *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1254055 (5th Cir. 1995)).

[251] *Warren v. County Com'n of Lawrence County, Ala*., 826 F.Supp.2d 1299 (N.D. Ala. 2011) (quoting *Lewis v. Federal Prison Indus*., 953 F.2d 1277, 1280 (11th Cir. 1992)).

[252] *Tucker v. Hous. Auth. of Birmingham Dist*., 507 F.Supp.2d 1240, 1281 (N.D. Ala. 2006) (quoting *Goldstein v. Manhattan Indus., Inc.,* 758 F.2d 1435, 1449 (11th Cir. 1985).

Once the Court determines reinstatement is not feasible, it must consider an award of front pay. Plaintiff did not plead front pay, but it is not required that the plaintiff plead front pay for the Court consider it. The Fifth Circuit has said the Plaintiff is not required to plead front pay under Federal Rule of Civil Procedure 54, which states "except as to a party against whom a judgment is entered by default, every final judgment shall grant relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."[253]

Nevertheless, the plaintiff bears the initial burden of proof in establishing a claim for front pay[254] by providing the district court "with the essential data necessary to calculate a reasonably certain front pay award," including "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate."[255] If a plaintiff fails to supply the Court with the information necessary to "calculate a reasonably certain award," the Court may reject the plaintiff's front pay request.[256] In determining whether front pay is appropriate, a court "should consider the length of employment, the permanency of the position held, the nature of the work, the age and physical condition of the employee, possible consolidation of jobs and the myriad other non-discriminatory factors which could validly affect the possible [plaintiff/employee] post-discharge employment relationship."[257] After considering these

---

[253] *Reneau v. Wayne Griffin & Sons, Inc.,* 945 F.2d 869, 870 (5th Cir. 1991).
[254] *Ogden v. Wax Works, Inc.,* 29 F. Supp.2d 1003, 1012 (N.D. Iowa 1998).
[255] *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1372 (7th Cir. 1992).
[256] *Id.*
[257] *Reneau v. Wayne Griffin & Sons, Inc.,* 945 F.2d 869, 871 (5th Cir. 1991).

factors, "[a] court may deny front pay because of insufficient evidence."[258] Further, an award of front pay must not grant plaintiff a windfall.[259]

In this case, Plaintiff was employed at CASS less than four months, from March 29, 2018 to July 9, 2018. Plaintiff is a young woman in good physical condition and will not be handicapped in her pursuit of other employment. Plaintiff provided no evidence of the length of time she expected to work for CASS, how long employees tended to be employed there, how COVID-19 may have affected employment opportunities at CASS, and whether Plaintiff's former position is available at this time. Plaintiff did not present any evidence that front pay would be necessary to make her whole and did not provide sufficient evidence for the Court to determine a reasonably certain amount of front pay owed. Instead, Plaintiff testified she was in the process of securing full time employment and that she had gone through multiple steps in the application process to become a firefighter and was hopeful she would be given the employment opportunity.[260] Plaintiff did not meet her burden of proving she is entitled to front pay.

## IX. Plaintiff is Awarded Pre-Judgment and Post-Judgment Interest.

"Federal courts apply a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act."[261] In this case, Title VII does not preclude pre-judgment interest and Title VII's remedial provisions "are intended to give courts wide discretion in exercising their equitable powers" to restore injured parties to where they

---

[258] *Id.* at 870.
[259] *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 732 (5th Cir. 2007) (citing *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1146 (10th Cir. 2006)).
[260] Plaintiff's Testimony; *See also* Exhibit 35.
[261] *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 13300, 1339 (5th Cir. 1995).

would have been if not for the unlawful discrimination.[262] The Court has discretion to select an equitable rate of interest[263] to make a Title VII plaintiff whole and may vary it depending on the circumstances of the case.[264]

"Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute."[265] The causes of action in this case involve a federal statute, Title VII. Therefore, the Court uses its discretion to implement a federal measure of interest calculation. The Court will award pre-judgment interest on compensatory damages and backpay using the Federal Reserve Bank's prime rate of interest.[266] Pre-judgment interest shall be compounded on an annual basis.

Pre-judgment interest is ordinarily awarded from the date of the loss.[267] The Fifth Circuit has stated "District courts generally should calculate interest on back pay and past damages based on the date of the adverse employment action."[268] Plaintiff was terminated from employment with CASS on July 9, 2018. She is awarded pre-judgment interest on her compensatory damages and back pay from July 9, 2018 until the date of the judgment.

Post-judgment interest is to be calculated based on the mandatory rate in 28 U.S.C. § 1961.

## X.   Plaintiff is Awarded Attorneys' fees and Expert Witness Fees.

Under 42 U.S.C. § 2000e-5(k) "the court, in its discretion, may allow the prevailing party. . . a reasonable attorney's fee (including expert fees)." The Court has determined

---

[262] *Bricklayers Pension Trust Fund v. Taiariol*, 671 F.2d 988 (6th Cir. 1982).
[263] *Williams v. Trader Publishing Co.*, 218 F.3d 481, 487 (5th Cir. 2000); *Bowers v. UnumProvident Corp.*, 2002 WL 10467 at *6 (E.D. La. Jan 2, 2002).
[264] *Raspanti v. U.S. Dept. of the Army,* 2001 WL 1081375 at *12 (E.D. La. Sept. 10, 2001).
[265] *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995).
[266] *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).
[267] *Offshore Specialty Fabricators, LLC v. Dumas Intern., Inc.,* 982 F.Supp.2d 695, 706 (E.D. La. 2013).
[268] *Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002) (citing *Gloria v. Valley Grain Prods., Inc.,* 72 F.3d 497, 499 (5th Cir. 1996).

Plaintiff prevailed on her causes of action under Title VII for retaliation and sexual harassment hostile work environment. Accordingly, the Court awards attorneys' fees and expert witness fees to Plaintiff. The Court refers the matter of determination of the appropriate amount of attorneys' fees and expert witness fees to the Magistrate Judge assigned to this case.

## XI.   Plaintiff is Not Awarded Punitive Damages.

"Title VII provides for the imposition of punitive damages in intentional discrimination cases if an employer acts with malice or reckless indifference to an employee's rights."[269] The Court does not find CASS acted with malice or reckless indifference. Accordingly, the Court does not award punitive damages in this case.

## <u>CONCLUSION</u>

Based on the above Findings of Fact and Conclusions of Law, the Court finds Plaintiff Nigil Dowdell is entitled to recover from Defendant Culpepper and Associates compensatory damages for emotional distress and loss of enjoyment of life in the amount of $25,000 and backpay in the amount of $72,733.73.

Pre-judgment interest is awarded on compensatory damages and back pay from the date of Plaintiff's termination to the date of judgment, calculated using the Federal Reserve Bank's prime rate, and compounded on an annual basis.

Post-judgment interest is awarded from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.[270]

The Court awards Plaintiff reasonable attorneys' fees and expert witness fees in an amount to be determined by the assigned Magistrate Judge.[271] Plaintiff shall file a motion

---

[269] *Williams v. Trader Publishing Co.*, 218 F.3d 481, 487 (5th Cir. 2000) (citing 42 U.S.C. § 1981a(b)(1)).
[270] 28 U.S.C. § 1961.
[271] The Plaintiff may file a motion to tax the cost under Local Rule 54.3.

for determination of attorneys' fees and expert witness fees with supporting documentation, by no later than December 8, 2020.

**New Orleans, Louisiana, this 17th day of November 2020.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**